IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01005-MEH

JASPER OSTROM,

     Plaintiff,

v.

MOUNTAIN TOP ICE CREAM OF VAIL II, INC.,

     Defendant.

---

**ORDER**

---

**Michael E. Hegarty, United States Magistrate Judge**.

Defendant Mountain Top Ice Cream of Vail II, Inc. ("Mountain Top") seeks summary judgment on all six of Plaintiff Jasper Ostrom's employment discrimination claims.[1] Based on the facts of this case, believe that Ms. Ostrom could present a jury issue on race discrimination and hostile work environment under 42 U.S.C. § 1981 and the Colorado Anti-Discrimination Act ("CADA") (Colo. Rev. Stat. §§ 24-34-402 *et seq.*), but not on sex discrimination and hostile work environment under CADA. However, because Ms. Ostrom cannot establish that those who engaged in the racially offensive conduct were supervisors under clear United States Supreme Court authority, nor that her employer was negligent in permitting the conduct to occur, I am constrained to grant summary judgment and dismiss all claims, except for her alleged constructive discharge

---

[1]The "Complaint with Jury Demand" filed May 9, 2019 (which is actually a first amended complaint) contains eleven causes of action. By dismissals dated February 7, 2020 (ECF 21) and March 20, 2020 (ECF 31), Ms Ostrom voluntarily dismissed her First, Second, Fifth, Sixth, and Eleventh Claims.

based on the perceived failure of Mountain Top in remedying the discrimination and hostile environment.

**FINDINGS OF FACT**

I make the following findings of fact viewed in the light most favorable to Ms. Ostrom, who is the non-moving party in this matter.

1.     At all times relevant to this case, Ms. Ostrom was a seventeen-year-old white female. Compl. ¶3.

2.     Mountain Top is a Haagen-Dazs franchisee, owned and operated by Ric Almas.  Compl. ¶¶ 19-20.  Almas split his time between his interests in Florida and his ownership of Mountain Top, being present only part time in Colorado (including eleven days in December 2017).  Reply Exh. A, ¶¶ 3-4.  The eleven days in December 2017 included December 19, 20, 22, 23, and 24.  *Id.*

3.     Ms. Ostrom was a part-time employee of Mountain Top from July 2017 to September 2017, and also in December 2017.  Her title was Server.  She earned $13 per hour, with no additional benefits.  Mot. Exh. A, at 2; Exh. B, at Interrogatories 1-2.  Mountain Top's employees Joshua Murphy and Joseph Harla had more seniority than Ms. Ostrom; indeed, Murphy was Mountain Top's most tenured employee.  Resp. Exh. 1, ¶ 14.  Murphy is described by Mountain Top as a shift manager, with responsibility for stocking, cash register, changing the product on display, and assisting other employees in the operation of the store.  Mot. Exh. B, at Interrogatories 3-4.  Harla was also a shift manager.  *Id.*  When Almas was not there, Murphy directed the actions of other employees.  *E.g.*, Resp. Exh. 1, ¶ 17.  Murphy and Harla also closed the store at the end of the business day.  Resp. Exh. 1, ¶ 22.

4.     Prior to December 24, 2017, Almas received no complaint that employees Murphy or Harla

had consumed alcohol or were intoxicated at work, or that Murphy possessed a firearm at work. Mot. Exh. B at Interrogatories 8-9, 11.

5.  In December 2017, Ms. Ostrom was dating a black male. Complaint ¶¶ 22, 25; Mot. Exh. A, at 1. Murphy and Harla knew this. Resp. Exh. 1, ¶1.

6.  Prior to December 22, 2017, Ms. Ostrom did not experience any incidents of race discrimination and/or sex discrimination while working for Mountain Top. Mot. Exh. C, at Interrogatory 8.

7.  Prior to December 22, 2017, Almas received no complaint from Ms. Ostrom, or anyone else, regarding race discrimination, racially offensive language, sex discrimination, unwelcome physical touching, discussions of gun possession, or threats to the well-being/safety of Ms. Ostrom's boyfriend. Mot. Exh. B, at Interrogatories 12-18.

8.  On Friday, December 22, 2017, Ms. Ostrom arrived at work around 5:00 p.m. She worked a complete shift, leaving at around 10:30 p.m. Complaint ¶ 29; Mot. Exh. A, at 2; Exh. D, at 9.

9.  On December 22, 2017, Ms. Ostrom experienced what she described to police as "slight harassment." Mot. Exh. E, at 1. Murphy and Harla consumed alcohol and became intoxicated at work that day. Resp. Exh. 1, ¶¶ 35, 37. Murphy grabbed Ms. Ostrom's head and kissed the top of her hat. Ms. Ostrom viewed this conduct as unwelcome. Resp. Exh. 1, ¶38. That evening, Murphy directed Ms. Ostrom to decorate a cake, and when she did not do so properly, he began to yell at her. The situation became worse when Murphy raised his voice. Murphy called Ms. Ostrom a "bitch" several times. Murphy told Ms. Ostrom that Almas was "pissed" at her. Resp. Exh. 1, at ¶¶ 39, 41. Ms. Ostrom viewed Murphy and Harla's conduct on December 22, 2017 to be unwelcome, offensive, threatening, and adversely altering the conditions of her employment and creating a

hostile and abusive working environment. Resp. Exh. 1, ¶¶ 52, 56. However, Ms. Ostrom did not, at that time, attempt to speak with Almas about the harassment. Mot. Exh. F, at Interrogatory 3.

10.     On December 23, 2017, Ms. Ostrom's boyfriend sent a text message to Murphy, which states:

"I don't appreciate how you spoke to and treated Jasper the other day, you need to be sober at work and if this doesn't change I will be speaking with your upper management." Mot. Exh. G. In response to the text message from Ms. Ostrom's boyfriend, Murphy responded, "I didn't know she had a part in making that cake. But she is a big part of my team and I never meant to offend anyone." Mot. Exh. G. Also on that day, Ms. Ostrom received an apology text message from Murphy, who told her that she was a valuable member of the team. Mot. Exh. D, at 9. Ms. Ostrom thought everything was "ok" after receiving that text message, and she did not anticipate any issues when she came to work the following evening. Mot. Exh. D, at 10.

11.     On December 24, 2017, Ms. Ostrom worked at the shop with Murphy and Harla. Mot. Exh. D, at 10. Murphy and Harla were at work and, again, were intoxicated. Resp. Exh. 1, ¶ 46. On that day, Murphy got emotional and started crying about his dad and about his "rough" life. Mot. Exh. E, at 2. Thereafter, an argument occurred between Ms. Ostrom, and Murphy and Harla, in which Ms. Ostrom lost her temper. Mot. Exh. D, at 16.

12.     Murphy acted threatening toward Ms. Ostrom, and he talked about guns. Murphy asked Ms. Ostrom, "we are good from Saturday?", which she took as a threatening way of asking if she had a problem with his conduct. Murphy also asked Ms. Ostrom, "Do I have to have you hold the gun up to his head [her boyfriend] and pull the trigger?" Murphy stated to a friend of his in the store, while pointing at Ms. Ostrom: "I'm gonna shoot her nigger boyfriend." Ms. Ostrom heard the

comment and saw Murphy point at her and make a gesture with his hand like it was a gun. Resp. Exh. 1, ¶¶ 48-51, 53.

13.     During this incident, Ms. Ostrom was assisting a black couple, and when Murphy made the comment about her "nigger" boyfriend, he was close enough and loud enough for the couple to hear the comment. Murphy's comments concerning the gun made Ms. Ostrom feel frightened for her safety and her boyfriend's safety. Because of the totality of the situation, Ms. Ostrom had a panic attack and fell to the floor in a fetal position. While Ms. Ostrom was on the floor, Murphy attempted to touch Ms. Ostrom, and she pushed him away and she stood up. Ms. Ostrom began running out of the store saying she was going to call the police. Harla grabbed her aggressively and yelled at her not to call the police; Murphy yelled at her: "You are fired. I am taking you off the system, and you are done." Resp. Exh. 1, ¶¶ 52, 54-57.

14.     Ms. Ostrom viewed Murphy and Harla's conduct on December 24, 2017 to be unwelcome, offensive, threatening, and adversely altering the conditions of her employment and creating a hostile and abusive working environment. Resp. Exh. 1, ¶ 70.

15.     On that same day, December 24, 2017, when Almas arrived at the shop, he observed Murphy having a seizure and being assisted by paramedics. Mot. Exh. B, at Interrogatory 6. Murphy was taken by ambulance to Vail Health for medical treatment. Mot. Exh. D, at 16. In the store, Almas found a paper bag with seven mini-bar bottles of liquor; all of them, except one, were empty. Mot. Exh. 4, ¶ 5.

16.     Both Ms. Ostrom and Almas spoke with the Vail Police Department on December 24, 2017. Mot. Exh. D, at 6; Exh. B, at Interrogatory 6. Ms. Ostrom told the responding officer that she wanted to continue her employment with Mountain Top, but wanted Murphy and Harla to be fired.

Mot. Exh. D, at 10, 16. Ms. Ostrom told the Vail Police Department that she did not want to pursue criminal charges against Murphy. Mot. Exh. D, at 14.

17.     Vail police did not find sufficient evidence to charge anyone with a crime. Mot. Exh. D, at 16. However, Murphy did state to Vail police, "These fucking sand niggers." Mot. Exh. D, at 5. Murphy also told the police that "the fucking niggers" come into the store with weapons. *Id.*

18.     On December 25, 2017, Harla contacted Ms. Ostrom and apologized to her. Mot. Exh. D, at 14.

19.     Ms. Ostrom spoke with Almas following the events of December 22, 2017 and December 24, 2017. Mot. Exh. A, at 3. Ms. Ostrom made an informal complaint to Almas that Murphy and Harla yelled at her and grabbed her, which resulted in her running away from the store. Mot. Exh. C, at Interrogatory 9.

20.     Almas offered Ms. Ostrom continued employment with Mountain Top. Mot. Exh. A, at 3; Exh. C, at Interrogatory 11; Exh. B, at Interrogatories 6, 19 & Request for Admission 14. Ms. Ostrom explained to Almas that "she could not work with Murphy and Harla," Mot. Exh. B, at Request for Admission 15, and for that reason did not return to work. Mot. Exh. C, at Interrogatory 12.

21.     Ms. Ostrom did not return to work at Mountain Top after December 24, 2017. Mot. Exh. C, at Interrogatory 12. Murphy and Harla continued to work at Mountain Top without any suspension. Mot. Exh. B, at Interrogatories 19-22 & Request for Admission 17. Thereafter, Almas did not observe Murphy or Harla consuming alcohol at work, intoxicated at work, or engaging in sex discrimination or race discrimination at work. Further, Almas received no complaints regarding Murphy or Harla after December 24, 2017. Mot. Exh. B, at Interrogatory 20-22.

22.    Ms. Ostrom had no period of unemployment and obtained as good, or better, paying jobs immediately upon separation from Mountain Top.  Mot. Exh. C, at Interrogatories 3, 7; Mot. Exh. H.

<u>**LEGAL STANDARDS**</u>

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

A.    Reviewing Race Discrimination/Hostile Environment Claims under these Facts

For the Section 1981 race discrimination and hostile work environment claims, and the CADA sex and race discrimination and accompanying hostile work environment claims, I start with some basic principles with which the parties do not disagree. First, "alleged discrimination against a white person because of his association with blacks may state a cause of action under Section 1981." *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989). I will assume this is also true for claims under CADA, which are analyzed under the same standards as Title VII (see below). *Fitzgibbon v. R & L Carriers Shared Servs., L.L.C.*, No. Civ-08-1333-R, 2010 WL 11508661, at *2 (W.D. Okla. Mar. 29, 2010) (citing other circuit courts holding that a white

employee may bring a Title VII claim for race discrimination or hostile work environment based on association with blacks).

Second, claims under Section 1981 and CADA are analyzed under the Title VII framework. *E.g., Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018); *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (section 1981 claim for employment discrimination based on race involves the same analysis as those brought under Title VII); *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1253 (Colo. 2001) ("we have held that our statute closely parallels its federal counterpart in Title VII of the Civil Rights Act and have expressly adopted the order and allocation of proof required for employment discrimination claims filed pursuant to that Act." (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997))).

B.      Reviewing Sex Discrimination/Hostile Environment Claims under these Facts

As noted above, Ms. Ostrom's sex discrimination and sexually hostile work environment claims, brought under CADA, are analyzed under the traditional framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

C.      Is There a Triable Issue of Fact on Discrimination or Hostile Work Environment?

As I view this case, two issues are primary. First, were the incidents on December 22 and 24, 2017, sufficient to create a triable issue of fact on Ms. Ostrom's claims of race and sex discrimination and hostile environment? If so, then second, was Murphy and/or Harla a "supervisor" such that Mountain Top should be held accountable for their actions? Although the answer to either one of these inquiries is dispositive on summary judgment, I must analyze both, because, as noted below, I believe this is one of the rare cases the United States Supreme Court did not necessarily foresee when it adopted a definition of "supervisor" for purposes of liability for

9

discrimination and harassment. Further, the law provides that an employer may not be liable for damages for some acts of discrimination, or for the creation of a hostile work environment, but the employer may still be liable for the constructive discharge of an employee based on a failure to take appropriate steps to remedy the offensive workplace conduct.

1.      Facts Supporting Discrimination/Hostile Work Environment

Regarding hostile work environment, it is settled that a single workplace incident, if sufficiently severe *or* pervasive to alter the conditions of the victim's employment, can suffice "to make out a hostile work environment claim." *See Cash v. Lockheed Martin Corp.*, 684 F. App'x 755, 761 (10th Cir. 2017) (citing *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008)). With regard to the use of the work "nigger," the Tenth Circuit has recently studied its impact on this analysis:

> Some of our sister circuits have offered helpful commentary on the potentially strong polluting power of this the time-worn word, "nigger." For instance, the Fourth Circuit has said: "'[T]he word "n* * * *r" is pure anathema to African-Americans,' as it should be to everyone." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014) (citation omitted) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)). "Therefore," it reasoned, "when viewing the circumstances as a whole, we find the use of the word 'n* * * *r,' coupled with the on-going offensive racial talk, ... is sufficient evidence for a reasonable jury to find the race-based harassment was objectively severe or pervasive." *Id.* And the D.C. Circuit has similarly opined:

>> [A] reasonable jury could find Cooper and Wagner's behavior sufficiently severe or pervasive as to create a hostile work environment. To begin with, Cooper (allegedly) used a deeply offensive racial epithet when yelling at [Plaintiff] to get out of the office. As other courts have observed, "perhaps no single act can more quickly alter the conditions of employment" than "the use of an unambiguously racial epithet such as 'nigger' by a supervisor." This single incident might well have been sufficient to establish a hostile work environment.

> *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (citation omitted) (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.

10

1993)); *see also Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997) ("[U]se of the word [nigger] even in jest could be evidence of racial antipathy." (quoting *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 114 (7th Cir.1990))); *Kennedy*, supra, at 22 ("Over the years, nigger has become the best known of the American language's many racial insults, evolving into the paradigmatic slur.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1229-30 (10th Cir. 2015). The ultimate question for me to decide is whether "a reasonable jury could find on this record that the subjective and objective effect of [Defendants'] conduct was to pollute the environment with harassing conduct that was, inter alia, racially humiliating, offensive, or insulting." *Id.* at 1232. The conduct here involves repeatedly referring to Ms. Ostrom's boyfriend as a "nigger" and repeatedly threatening to shoot him, including the nonverbal conduct of simulating the firing of a gun.[2] This conduct resulted in Ms. Ostrom lying on the floor of Mountain Top in a fetal position and ultimately running out of the store to the police. This, along with the other conduct that occurred those two days in December 2017, is sufficient to create a jury question on the issue of racially hostile work environment and, for that matter, race discrimination. *See Tademy*, 614 F.3d at 1144 (the "severe or pervasive" inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact.") (citation omitted). This is especially true given the mandate that I must view the facts in the light most favorable to Ms. Ostrom.

I do not believe that the same is true for the claim of sexually hostile work environment (or sex discrimination). One or two uses of the term "bitch" in the same moment is not sufficient to create a jury question on these claims. *E.g., Garcia v. Albuquerque Pub. Sch., Inc.*, No. CV

---

[2]I also note that the death threats against Ms. Ostrom's boyfriend are not far afield from the type of "lynching" threats courts have considered as "severe." *E.g.*, *Tademy*, 614 F.3d at 1144.

12-00850 MV/LAM, 2015 WL 13665443, at *25 (D.N.M. Mar. 26, 2015) (citing cases); *Villalva v. Dillon Cos, Inc.*, No. 12-cv-02005-PAB, 2013 WL 6804585, at *8 (D. Colo. Dec. 23, 2013). The term is offensive, but in the context of the facts described above, indicates that its use was not motivated by gender, but by a heated workplace argument during which Plaintiff admits that she lost her temper as well. The alleged "kissing" of Ms. Ostrom's hat does not move the needle. Especially in light of the undisputed facts that the alleged sexually tainted conduct was temporally isolated, with no prior incidents of that nature ever having been experienced by Ms. Ostrom; that Murphy and Harla were intoxicated during the incident; and, that the alleged sex discrimination occurred only on December 22, 2017, after which Ms. Ostrom received an apology from Murphy, these facts do not rise to the level of a triable jury question.

2.      Supervisory Liability

The offensive conduct in this case was committed not by the owner of Mountain Top, but by two co-workers of Ms. Ostrom. "[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (citation omitted). In *Vance*, the Supreme Court rejected an argument that the ability to direct the work of a co-employee was sufficient to qualify such person as a supervisor. The Court said it was not enough that a "co-worker[] possess[es] the authority to inflict psychological injury by assigning unpleasant tasks or by altering the work environment in objectionable ways." *Id.* at 445. The Court noted that in such a case, a plaintiff can still prevail by proving the employer was

12

negligent in allowing the conduct to occur.  But for imposing liability in the absence of employer

negligence, the Court opted for the bright-line test stated above, which the Court intended to be

determined at the summary judgment stage, *id*. at 443, thus keeping the fact question of who is a

"supervisor" from being given to the jury.  *Id.* at 443-45.

The Court was well aware, by means of the dissent, that this bright-line test potentially could

result in "the plaintiffs [losing] in a handful of cases involving shocking allegations of harassment,"

*id.* at 447, although the majority did not expressly foresee any such situation.  Writing for the Court,

Associate Justice Alito countered that "[e]vidence that an employer did not monitor the workplace,

failed to respond to complaints, failed to provide a system for registering complaints, or effectively

discouraged complaints from being filed would be relevant" to finding potential liability even if the

harasser was not a supervisor.  *Id*. at 448-49.  Here, there is no such evidence.  I believe the Court

acknowledged the possibility of the type of case before me today when it stated:

> [The dissent speaks of hypothetical] cases where an employee who cannot take
> tangible employment actions, but who does direct the victim's daily work activities
> in a meaningful way, creates an unlawful hostile environment, and yet does not wield
> authority of such a degree and nature that the employer can be deemed negligent
> with respect to the harassment. We are skeptical that there are a great number of such
> cases. However, we are confident that, in every case, the approach we take today will
> be more easily administrable than the approach advocated by the dissent.

*Id.* at 450.

In the record on summary judgment, there is no evidence that Almas *empowered* Murphy

or Harla to take tangible employment actions against Ms. Ostrom, but only that in minor, practical,

and unavoidable ways, those two co-workers had some ability to direct Ms. Ostrom's daily work

activities (they being more senior and older than Ms. Ostrom).  Because I believe this case falls

squarely within the rare circumstance described by the Supreme Court, I have no choice but to find

that Mountain Top is not vicariously liable for Murphy's and Harla's actions here, and to grant summary judgment for Mountain Top. *E.g., McCafferty v. Preiss Enterprises, Inc.*, 534 F. App'x 726, 728 (10th Cir. 2013) (co-worker who was a "shift manager"; directly oversaw the work of co-workers; assigned specific duties; scheduled breaks; requested some workers to cover other workers' shifts; authorized co-workers to stay on the clock beyond their shifts; and sent co-workers home if work was light, was not a supervisor under *Vance*).

Under *Vance*, the only issue that gives me pause is that the Court "left open the possibility that a supervisor's power to make tangible employment decisions may be imputed to a subordinate if an employer 'attempt[s] to confine decisionmaking power to a small number of individuals' with 'a limited ability to exercise independent discretion when making decisions,' and who accordingly must 'rely on other workers who actually interact with the affected employee.'" *McCafferty*, 534 F. App'x at 731. *See Vance*, 570 U.S. at 447 (The "employer may be held to have effectively delegated the power to take tangible employment actions to" a plaintiff's co-worker, thus potentially making the co-worker a supervisor). While it appears Almas was, at most, only half-time at the shop, Mountain Top is an ice cream parlor and not a factory or office setting, and it does not appear to me that moment-by-moment supervision is critical in a small retail store. However, it is also clear that Almas regularly interacted with employees, including Ms. Ostrom, and Ms. Ostrom had the ability to make contact with Almas frequently. The record before me indicates that Ms. Ostrom did not make an effort to speak to Almas before December 24, 2017 about any alleged discrimination or harassment (despite what had occurred on December 22, 2017).

I could find no precedent indicating that in a situation in which the harasser is the first among equals, and may have the ability to direct a plaintiff's actions day-to-day, the court found the

harasser to be a supervisor. Further, there is absolutely no evidence that Almas ever sought input from anyone on whether to hire or fire an employee. I can only assume that Ms. Ostrom sought appropriate discovery on this issue and was unable to establish any contrary facts. There is no evidence in the record about any ability of Murphy to influence hiring/firing decisions. What Ms. Ostrom does rely on is that Almas never informed her that he was solely responsible for hiring/firing decisions; Murphy and Harla were the only employees she saw handling closing the store at the end of the business day; she saw Murphy direct Harla to perform work on projects; Murphy would also direct her to perform tasks; and Murphy yelled at her that she was fired as she was fleeing the store on December 24, 2017. The undisputed facts show that contrary to Murphy's heat-of-passion statement, Ms. Ostrom was not fired at that time. In fact, Ms. Ostrom alleged in her formal complaint of discrimination that on December 24, 2017, "Murphy told Ms. Ostrom that if she did not quit, *he* would quit." ECF 19-1 at 2 (emphasis added). These are hardly the words of a purported supervisor to a subordinate. Only after meeting with Almas and determining that Murphy and Harla were not going to be fired did Ms. Ostrom quit her position. Even considering all the alleged supervisory exercise of authority by Murphy, I must find that *Vance* and *McCafferty* dictate the result here.

Plaintiff relies on *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726 (10th Cir. 2014), as support for finding that Murphy was a supervisor for liability purposes. The *Kramer* court held that if a co-worker "had or appeared to have the power to take or substantially influence tangible employment actions and used the threat of taking such actions to subject [plaintiff] to a hostile work environment, then the [employer] is vicariously liable." *Id.* at 739. Here, it was not Murphy's threat

15

to fire Ms. Ostrom (which occurred as she was running away from the shop) that created the hostile work environment, but rather his obscenities and threats about her boyfriend.

Therefore, on these facts, I cannot find a jury issue on whether Murphy or Harla was a supervisor, nor can I find that Almas was negligent in allowing the racially offensive conduct to occur. For that reason, Mountain Top is not liable for damages for the race discrimination and hostile work environment that was created December 22-24, 2017.

D.     Constructive Discharge

This leads me to the one issue that should be tried to a jury: Was Almas' refusal to fire Murphy and Harla a constructive termination of Ms. Ostrom's employment? I believe there are material issues of fact that preclude summary judgment on this issue.

First, as I describe above, for purposes of a summary judgment analysis, this one, severe incident of race discrimination and hostile environment would be enough to support a verdict for Ms. Ostrom, if Murphy and Harla had been supervisors under the *Vance* test. This situation is like that in *Hirschfeld v. New Mexico Corr. Dep't*, 916 F.2d 572 (10th Cir. 1990). There, the court found that the employer was not liable for a co-worker's harassment of the plaintiff. The court proceeded to analyze whether the plaintiff's subsequent departure from the employer was a constructive discharge (in that case, it was not). The court stated: "An employer notified that an employee is engaging in hostile work environment sexual harassment is not obligated to discharge or demote the harasser in every case. . . . [But] there may be egregious cases where such action is the only option for an employer . . . ." 916 F.2d at 578 n.6. The issue is whether a reasonable factfinder could see Almas' actions (or non-actions) as unreasonable in this case. "[A]n employer is not liable . . . so long as each response was reasonable. It follows that an employer is not required to terminate a

perpetrator except where termination is the only response that would be reasonably calculated to [

] end the harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998).

Mountain Top has offered no evidence of any discipline of Murphy or Harla. In fact, nothing

in the record indicates Almas took any corrective action whatsoever, despite his knowledge of Ms.

Ostrom's allegations of December 22 and December 24, 2017, and his discovery of alcohol on the

premises. It is a jury question as to whether the conduct by Murphy and Harla was so egregious as

to require termination, whether Almas' remedial action, if any, was reasonable, and whether Ms.

Ostrom's refusal to return to a workplace in which she would likely have to confront the co-workers

who engaged in such offensive conduct was reasonable. A jury may well decide that no reasonable

employee could be expected to be forced to work with Murphy and Harla again. Although there is

an allegation that Almas offered to have Ms. Ostrom work on shifts when Murphy and Harla were

not present, Ms. Ostrom denies that such an offer was made and, in any event, the practicality of

such an arrangement in a small ice cream shop is a matter I will leave for the jury.[3]

For these reasons, I find summary judgment is not appropriate on the constructive discharge

aspect of Ms. Ostrom's claims of race discrimination and hostile work environment based on race,

---

[3] Although Mountain Top alleges, and Plaintiff does not dispute, that she found a job "[i]mmediately following her employment with Mountain Top," Mot. at 9 ¶, the elements of a constructive discharge claim do not require actual damages. "[A] constructive-discharge claim [is] . . . comprise[d of] two basic elements: discriminatory conduct such that a reasonable employee would have felt compelled to resign and actual resignation." *Green v. Brennan*, 136 S. Ct. 1769, 1772, 195 L. Ed. 2d 44 (2016). *See Wilson v. Bd. of Cty. Comm'rs of Adams Cty.*, 703 P.2d 1257, 1259 (Colo. 1985) ("To prove a constructive discharge, a plaintiff must present sufficient evidence establishing deliberate action on the part of an employer which makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign.").

17

under Section 1981 and CADA.  Of course, she will only be entitled to one recovery regardless of the number of claims from the Complaint that are actually pending at the time of trial.

## CONCLUSION

For the foregoing reasons, Mountain Top's Motion for Summary Judgment, ECF 19, is **granted in part** and **denied in part**.  All claims in the Complaint are dismissed with prejudice except for Ms. Ostrom's claims of race discrimination and hostile work environment insofar as she seeks damages for constructive discharge.

Entered and dated at Denver, Colorado, this 13th day of April, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge